898 F.2d 493
 65 A.F.T.R.2d 90-957, 90-1 USTC P 50,160
 UNITED STATES of America, Plaintiff-Appellant,
v.
BIG VALUE SUPERMARKETS, INC., d/b/a Perry's Pantry; Toledo
Trust Company; Country Charm Properties; State of Ohio,
Bureau of Workman's Compensation; State of Ohio, Bureau of
Employment Services; Heilman & Meyer, Inc.; Perrysburg
Land Company, Defendants-Appellees.
 No. 89-3210.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 7, 1989.
Decided March 12, 1990.
 
 Verne K. Armstrong, Office of the U.S. Atty., Toledo, Ohio, Gary R. Allen, Acting Chief, Joanne C. Rutkowski, William S. Estabrook (argued), Regina S. Moriarty, U.S. Dept. of Justice, Appellate Section Tax Division, Washington, D.C., for the U.S.
 John V. Kean, Sylvania, Ohio, for Big Value Supermarkets, Inc., d/b/a Perry's Pantry.
 Brian J. McKnight, Toledo Trust Co., Toledo, Ohio, for Toledo Trust Co.
 Russell R. Miller (argued), Barkon & Robon, Toledo, Ohio, for Country Charm Properties.
 Thomas J. Osowik, Toledo, Ohio, for State of Ohio, Bureau of Workman's Compensation, Bureau of Employment Services.
 Gerald M. Kobil, Perrysburg, Ohio, for Heilman & Meyer, Inc.
 Before KRUPANSKY and NELSON, Circuit Judges, and BROWN, Senior Circuit Judge.
 BAILEY BROWN, Senior Circuit Judge.
 
 
 1
 The United States appeals a district court order that limited the extent of a tax lien on real property of which the taxpayer was the vendee under an installment contract to the amount that the taxpayer had paid on the contract. The order also discharged the subject real property from the tax lien. Because we find that under Ohio law a vendee's interest that is created pursuant to a land installment sale contract is not limited to the amount paid on the contract, we reverse.
 
 FACTS
 
 2
 On December 7, 1976, Big Value Supermarkets, Inc. ("Big Value") leased from Heilman & Meyer, Inc. ("Heilman") real property located in Ohio. The agreement granted Big Value an exclusive option to purchase the property. In May, 1981, Big Value notified Heilman of its intention to exercise the option. Big Value requested that Heilman convey the property directly to Norman C. Hartsell, Trustee of the Joseph Trust;[1] however, Heilman refused to convey to anyone other than Big Value. On September 30, 1981, the federal government filed notices of federal tax liens, in the amount of $28,590.97, against any property or rights in property owned by Big Value.[2]
 
 
 3
 Big Value entered into an installment contract with Heilman on November 15, 1981. The purchase price was $120,000, including a $10,000 down payment and 150 monthly installments of $1,163.55 each. The exact market value of the property at the time of this agreement is not known; however, there is evidence to indicate that the property was worth between $155,000 and $250,000.[3] The standard form contract that the parties executed provided that "[a]dditional payments or entire payment of the principal may be made at any time." It also provided that "[u]pon fulfillment of Vendee's obligations under the terms of this contract, Vendor agrees to convey said property to Vendee by deed of general warranty." Joint Appendix 47.[4] The Joseph Trust paid to Heilman for Big Value both the $10,000 down payment and $3,200 that was due in back rent.[5]
 
 
 4
 Immediately after the parties had entered into the installment contract, Big Value quitclaimed any interest it had obtained to the Joseph Trust in exchange for a forgiveness of indebtedness of $50,000 owed by Victor Joseph to the trust. Subsequently, as the result of further transfers, Country Charm became the owner of the interest that Big Value originally had acquired.
 
 
 5
 During this period of Country Charm's ownership, the United States filed suit to reduce its lien to judgment and to foreclose on the subject real property. Country Charm responded that assuming the lien was valid, it attached only to Big Value's interest in the installment contract and not to the real property. The district court determined that the government could reach the real property, but only to the extent of the $13,200 that Big Value had paid towards the purchase price.
 
 
 6
 Subsequently, Country Charm tendered a check in the amount of $13,200 to the United States with a restrictive endorsement that stated that acceptance or negotiation of the check constituted full payment of the claim of the United States. After a government employee had sent the check to a depositary bank, the United States Attorney notified Country Charm that the government's acceptance of the check did not constitute an accord and satisfaction. The United States tendered a $13,200 check to Country Charm; however, Country Charm refused to accept it. Country Charm then moved for satisfaction of the judgment and release of the liens. The district court granted the motion and released the subject real property from the tax liens.[6]
 
 ANALYSIS
 
 7
 The government contends that the district court erred by finding that Big Value's interest in the real property subject to the government's lien was limited to the amount Big Value had paid towards the purchase price. The government's theory is that the taxpayer also owned the value equal to the difference between the contract price and the market value of the property. Because this difference was at least $35,000, Big Value's interest, according to the government, more than covered the total amount due under the tax liens. Country Charm, on the other hand, argues that the district court properly applied Ohio law, which Country Charm contends limits the vendee's interest in real property that is purchased pursuant to an installment contract to the amount that has been paid towards the contract price. Because the question in this case is one of law, we review it de novo. In re Edward M. Johnson & Assoc., 845 F.2d 1395, 1398 (6th Cir.1988).
 
 
 8
 A federal tax lien arises once an assessment occurs, and it attaches once the taxpayer fails to pay the taxes after demand has been made. I.R.C. Secs. 6321, 6322 (1989); Harris v. United States, 764 F.2d 1126, 1128 (5th Cir.1985). The lien attaches to all property and all rights to property of the taxpayer, I.R.C. Sec. 6321, including those acquired by the taxpayer after the lien arises, Glass City Bank v. United States, 326 U.S. 265, 267, 66 S.Ct. 108, 110, 90 L.Ed. 56 (1945). In the instant case, the tax lien was in existence at the time that Big Value exercised its option and entered into the contract with Heilman; therefore, the lien attached to whatever interest Big Value acquired at the time the contract was executed.
 
 
 9
 It is settled federal law that the United States may seize and sell both real and personal property of the taxpayer, both tangible and intangible, to satisfy its liens. G.M. Leasing Corp. v. United States, 429 U.S 338, 349-50 & 349 n. 15, 97 S.Ct. 619, 626-27 & 627 n. 15, 50 L.Ed.2d 530 (1977); see also I.R.C. Sec. 6331. However, federal law requires the government to join all parties who have an interest in the property so that the proceeds of the sale are correctly distributed. I.R.C. Sec. 7403(b); United States v. Overman, 424 F.2d 1142, 1146 (9th Cir.1970); United States v. Trilling, 328 F.2d 699, 703 (7th Cir.1964). Once the sale is made, the government must distribute the proceeds according to the "first in time, first in right" theory. United States v. Wingfield, 822 F.2d 1466, 1473 (10th Cir.1987), cert. dismissed sub nom. County of Boulder v. United States, 486 U.S. 1019, 108 S.Ct. 1762, 100 L.Ed.2d 222 (1988). The government may not obtain from the sale an amount greater than the extent of the interest the taxpayer held, which is determined by state law. Overman, 424 F.2d at 1146. We look to Ohio law, therefore, to determine Big Value's interest.
 
 
 10
 The district court relied on Woloveck v. Schueler, 19 Ohio App. 210 (1922), for its determination that Big Value's interest was limited to the amount paid on the contract. We find, however, that Woloveck is not controlling. In that case, the issue was whether a court of equity would declare a forfeiture of all payments made pursuant to a land installment contract and declare the contract void when the plaintiff-vendor could not convey marketable title to the defaulting vendee, who had paid a substantial portion of the contract price. The Ohio Court of Appeals refused to declare a forfeiture. The court made the following statement in the case, on which Country Charm relies:
 
 
 11
 We regard it as settled in this state, as it is in many states in the union, that a contract for the sale and purchase of real estate, where the vendee takes possession, which contract binds the vendee to pay therefor and binds the vendor to convey on payment of the price, gives to the vendee an equitable estate in the land equal to the amount of the purchase money paid by him, and which, upon full payment, may ripen into a complete equity, entitling him to conveyance of the legal title according to the terms of the contract, and that until such full payment and conveyance are made the vendor has the legal title and a beneficial interest in the lands to the extent of the unpaid purchase money.
 
 
 12
 Woloveck, 19 Ohio App. at 217-18. This statement defines the vendee and vendor's interests as they relate only to the contract price. Woloveck does not answer the question of who as between the vendor and vendee owns the difference in value between the market value and the contract price when land is sold by installment contract for less than its market value.
 
 
 13
 Ohio law defines a land installment contract as an executory agreement, which by its terms is not required to be fully performed within one year, and under which the vendor agrees to convey title to the vendee and the vendee agrees to pay the purchase price in installments, while the vendor retains title to the property as security for the vendee's obligation. Ohio Rev.Code Ann. Sec. 5313.01 (Anderson 1989). We note that the vendor may not place a mortgage on the property in an amount greater than the balance due on the contract without the consent of the vendee. Id. Sec. 5313.02(B).
 
 
 14
 The real property interests of the parties to the contract were defined in Blue Ash Building & Loan v. Hahn, 20 Ohio App.3d 21, 484 N.E.2d 186 (1984). Although the vendee is not the sole owner of the real property, he stands as the equitable owner with all obligations and incidents of ownership. The vendor, on the other hand, holds legal title. Id. at 24, 484 N.E.2d at 189. The Blue Ash court analogized these interests to the interests that arise between vendor and purchaser in an outright purchase of land during the period between when they enter into the contract to sell and purchase the land and when the actual conveyance takes place, under the doctrine of equitable conversion. The purchaser is considered in equity as the owner, similar to a mortgagor, while the vendor holds the bare legal title to the property as a trustee. Id. Under the doctrine, the purchaser bears all losses, Sanford v. Briedenbach, 111 Ohio App. 474, 482, 173 N.E.2d 702, 707 (1960), and he is entitled to all gains, Gilbert & Ives v. Port, 28 Ohio St. 276, 292 (1876).
 
 
 15
 In the instant case, the agreement between Big Value and Heilman also created contract rights in both parties. These contract rights are choses in action, which are valuable property rights under Ohio law. Lucas v. Limbach, 35 Ohio St.3d 71, 73, 518 N.E.2d 944, 946 (1988). Big Value had the right under the contract to compel the conveyance of the legal title upon its paying the remainder of the purchase price. At the same time, Heilman had the right to receive the remainder of the purchase price according to the payment terms agreed to by the parties.
 
 
 16
 At the instant when the installment contract was executed, the government acquired a lien on the same real property and contract rights that Big Value had acquired. Moreover, federal law gave the government the right to seize and sell the real property to satisfy its liens. The government had the choice, under the contract, of selling the property subject to Heilman's right to receive future payments or of paying the balance due Heilman in a lump sum and selling the property free of that encumbrance. Had it chosen this latter route, it could have recovered from the sale first, the $106,800 paid to Heilman, the full amount that Heilman was entitled to under the law, and second, $28,590.97 plus interest and penalties in satisfaction of the liens. The remainder, if anything, would have been distributed to Big Value, because all other interests with a higher priority would have been satisfied.[7]
 
 
 17
 Because the property in this case was worth at least $155,000, the government had the opportunity, through seizure and sale, to realize more than $13,200, the amount paid by Big Value on the contract. Regardless of the amount it would have received, however, the government succeeded to interests under Ohio law that were not limited in value solely to the amount that Big Value had paid towards the purchase price.
 
 
 18
 Country Charm urges us to find that because Big Value immediately quitclaimed its interest to the Joseph Trust, Big Value could not have acquired any interest greater than the amount of the down payment. We disagree. The interests we have described arose at the instant that Big Value and Heilman executed the agreement. Big Value acquired its interests prior to transferring these interests to the trust. It is settled federal law that transfers subsequent to the attachment of a federal lien do not affect the lien in any way. United States v. Bess, 357 U.S. 51, 57, 78 S.Ct. 1054, 1058, 2 L.Ed.2d 1135 (1958).
 
 
 19
 For the foregoing reasons, we REVERSE and REMAND to the district court for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 One beneficiary of the Joseph Trust was Victor Joseph, the sole Big Value shareholder
 
 
 [2]
 Big Value has stipulated that the amount of the tax liens is $28,590.97 plus interest and penalties since October 31, 1986, and that Big Value failed, neglected or refused to pay the assessments. The taxes were assessed in part on December 15, 1980, and in part on July 6, 1981
 
 
 [3]
 An opinion letter from Paul J. Burnor, A.S.A., dated May 7, 1981, indicated that the property had a value-in-use worth of $250,000 and a rental property value of $155,000. Supplemental Joint Appendix 49-50. Country Charm Properties ("Country Charm"), the present owner of the interest that Big Value originally acquired, does not dispute the fact that the market value of the property was greater than the contract price. Instead, it argues that the value of the property is irrelevant to the disposition of this case
 
 
 [4]
 The contract further indicated that the property was encumbered by a mortgage in favor of Citizens Banking Company, dated July 13, 1972. No information concerning the terms of this mortgage was made available to this court. Neither of the parties made any oral or written reference to it during the pendency of this appeal. Moreover, the government's complaint did not name Citizens Banking Company as a defendant-interested party. This opinion does not take into account any interest that Citizens Banking Company might have asserted
 
 
 [5]
 Although the installment contract indicates that a down payment of $10,000 was made and the purchase price was $120,000, the parties agree that the balance due was $106,800 rather than $110,000, because the $3,200 payment of back rent was considered to be part of the purchase price
 
 
 [6]
 The district court analyzed the motion as one claiming accord and satisfaction, and it denied the motion. Country Charm then moved the district court to vacate its order of denial and to find that Country Charm's payment constituted a complete satisfaction of the district court's original order that had limited the extent of the government's right to recover to the $13,200. The district court vacated its order and granted the motion. Country Charm does not contend that it is entitled to prevail on the theory that the government's initial acceptance of the check constituted an effective accord and satisfaction
 
 
 [7]
 We realize that there are other parties who have acquired interests in the subject property since Big Value quitclaimed its interest to the trust. Any sale of the property would, of course, require the government's joining all interested parties and distributing the proceeds according to the "first in time, first in right" theory